**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| MICHAEL PORTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-116-GKF-PJC |
| | ) | |
| FARMERS INSURANCE COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the court are defendant Farmers Insurance Company, Inc.'s ("Farmers") Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment [Dkt. ##98, 101]. This bad faith breach of insurance contract lawsuit arises from an auto accident on April 22, 2007. Plaintiff Michael Porter suffered head injuries when his Volkswagen ran off New Prue Road, hit a tree and flipped. Two days later, he was found in a stranger's house near the site of the accident. He was taken to St. John Hospital and treated for multiple skull and facial fractures. He had brain trauma, was disoriented, and could not remember details of the accident.

During 2008, Porter apparently made at least two calls to the agent, during which he did not identify himself, but "babbled" about an accident. In early 2009, he called the agency and asked a customer service representative for a copy of his policy, but did not tell the representative he had been in an accident.

In August 2009, he made a claim with Farmers, which he alleged had issued a policy covering the Volkswagen. Initially, Farmers concluded no policy covering the Volkwagen had been issued and the existing policy on plaintiff's truck had a waiver of UM coverage. His

attorney promptly advised Farmers its agent had given Porter a security verification for the Volkswagen, and Farmers promptly opened an investigation.  It determined that there had been a miscommunication between the agent and the insured, with the agent believing Porter had asked him to replace the Volkswagen for the truck on the existing policy, and Porter claiming he had asked the agent to issue a new policy.  The agent had never obtained a UM waiver for the Volkswagen.

Initially, plaintiff could not recall details of the accident, and the collision report prepared by the investigating trooper showed no indication another vehicle was involved.  However, on November 11, 2009, Porter testified in his examination under oath ("EUO") that a phantom driver had caused the accident.  On December 24, 2009, Farmers advised plaintiff's attorney that Farmers would pay Porter $25,000 in UM statutory benefits for the accident.  Because of a potential subrogation claim by Medicare and a DHS child support lien, the proceeds were not paid until November 4, 2011.

Plaintiff filed this action on February 24, 2010.  He asserts claims for breach of contract and bad faith, and seeks actual and punitive damages.  Farmers contends it is entitled to summary judgment on the breach of contract claim because the UM coverage statutory limits have been paid and on the bad faith claim because its handling and payment of the claim were reasonable.

The reasonableness inquiry focuses on the following issues:

1.   Whether Farmers' agent, Lehrman Agency, should have turned in a claim when plaintiff contacted it in early 2009.

2.   Whether, once an attorney for plaintiff submitted a claim to Farmers, it conducted a reasonable and timely investigation.

3.   Once Farmers determined it would pay UM coverage statutory limits of $25,000 to plaintiff, whether it tendered payment in a reasonable and timely manner.

## I. Material Facts

1. As of January 2007, Michael Porter was the named insured for a Farmers policy that insured his 1972 Ford truck.  [Dkt. #99, Ex. 1, Certified Policy No. 08 16175-84-93].

2. Porter had rejected UM coverage on the policy covering the Ford truck, and the insurance policy on the truck did not provide UM coverage.  [Dkt. #99, Ex. 2, UM Rejection].

### Porter's Call to Agent Regarding Volkswagen Coverage

3. Porter testified that in late January 2007, he contacted his Farmers agent (Lehrman Agency) and asked to purchase new coverage for a Volkswagen.  [Dkt. #99, Ex. 3, Plaintiff's 8/21/09 Statement, p. 4; Ex. 4, Porter Dep., 57:4-58:22].  Porter testified the agent asked him whether he was replacing the truck and he said, "well, no, I'm—still got the truck." [Dkt.  #111, Ex. 1, Porter Dep., 58:18-22].  Asked in his deposition about what kind of coverage he sought on the Volkswagen, he testified:

> I wanted the vehicle covered.  I wanted my children to be safe. So, yes, I wanted everything—I wanted the proper type of insurance.  I—I believe they even asked me about the UM coverage and told me that—that I would have to sign off on it if I didn't want it.  And I think I refused the fact that, well, no don't—I'm not going to sign off on it because I need property liability for my children, for the well-being of my children.
>
> Because I vaguely—I mean, not be racist, but there's too many Mexicans in this world now, and was back then, and a lot of people that don't have insurance.  And I don't want by kids in that position.  And anybody that lives that way is ignorant as far as I'm concerned.
>
> *   *   *
>
> I wouldn't let nobody ride in my car—I wouldn't even let you as an adult ride in my car without uninsured motorist.  Nobody rides in my vehicles without uninsured motorist but me.

[*Id.,* 59:18-60:21].

4.  Timothy Lehrman, the Agent's customer service representative who handled Porter's insurance coverage request, testified he spoke by telephone with Porter on January 29, 2007 and that Porter said to him, "I would like to make a car change."  [Dkt. #99, Ex. 6, Timothy Lehrman Dep., 16: 10-12; 16:23-24].  Lehrman testified that based on Porter's request, he "swapped one car out for another." [*Id.,* 35:14-17].  He described the process:

> I have a screen that I go in.  I replace the vehicle.  I put the new vehicle's policy—or identification number in it.  It pulls up the replaced vehicle, the new vehicle, takes out the old vehicle, and then I submit it.

[*Id.*, 35:19-23].  Lehrman testified that "sometime in between the actual change and the submit button, you are able to print a security verification form."  [*Id.,* 36:15-17].  When the "submit" button is hit, Farmers gets the information.  [*Id.,* 36:23-37:2].  In a "customer view comment screen," he logged in "[t]hat I made a car change from a '92—or from a pickup to a '92 Volkswagen, faxed verification forms." [*Id.,* 37:4-24].  Lehrman testified that he faxed a security verification form to Porter showing coverage on the Volkswagen. [*Id.,* 31:15-23].  A verification form for the Volkswagen for the period of 1/29/07 to 7/12/07 is attached as Ex. 4 to plaintiff's response brief.  [Dkt. #111, Ex. 5].  Lehrman testified he does not know why the change "did not go through all the way" to Farmers.  [Dkt. #99, Ex. 6, T. Lehrman Dep., 35:1-6].  Lehrman did not obtain a UM waiver for the 1993 Volkswagen.  [*Id.,* 32:2-4].  He testified that when a new policy is written, a UM form has to be signed, but when there is simply a car change on an existing policy, no UM needs to be signed.  [*Id.,* 53:12-20].

5.  Lehrman Agency office manager and customer service representative Cindy Fortney thinks it is possible that the policy change did not go through because Timothy Lehrman did not hit the "submit" button or that there was some failure on Farmers' side of the transaction.  [Dkt. #99, Ex. 7, Cindy Fortney Dep., 7:2-14; 42:12-22].

4

6. Farmers never issued a policy covering Porter's Volkswagen, nor did it charge Porter a premium for the Volkswagen.  [Dkt. #99, Ex. 8, Cheryl Jordan Affid., ¶¶4-5].

**Policy Provisions**

7. The policy number listed on the security verification for the Volkwagen is:  08 16175-84-93.  [Dkt. #111, Ex. 5].  Under "Definitions," the policy states:

**Your insured car** means:

1. The vehicle described in the Declarations of this policy or any **private passenger car** or **utility car** with which you replace it.  You must advise us within 30 days of any change of **private passenger car** or **utility car.**  If your policy term ends more than 30 days after the change, you can advise us anytime before the end of that term.
2. Any additional **private passenger car** or **utility car** of which you acquire ownership during the policy period.  Provided that:
   a. You notify us within 30 days of its acquisition, and
   b. As of the date of acquisition, all **private passenger** and **utility cars** you own are insured with a member company of the Farmers Insurance Group of Companies.
   
   Ownership shall include the written leasing of a **private passenger** or **utility car** for a continuous period of at least six months.

[#99, Ex. 1, Policy at 6].  The policy further states:

**PART II – UNINSURED MOTORST**
**Coverage C – Uninsured Motorist Coverage**
**(Including Underinsured Motorist Coverage)**

We will pay all sums which an **insured person** is legally entitled to recover as **damages** from the owner or operator of an **uninsured motor vehicle** because of **bodily injury** sustained by the **insured person.**  The **bodily injury** must be caused by **accident** and arise out of the ownership, maintenance or use of the **uninsured motor vehicle.**

Determination as to whether an **insured person** is legally entitled to recover **damages** or the amount of **damages** shall be made by agreement between the **insured person** and us.  IF no agreement is reached, the decision will be made by arbitration.

**Additional Definitions Used In This Part Only**

As used in this part:

1. **Insured person** means:

      a.  You or a **family member.**
      b.  Any other person while **occupying your insured car.**
      c.  Any person for **damages** that person is entitled to recover because of **bodily injury** to you, a **family member,** or another occupant of **your insured car**….

3.  **Uninsured motor vehicle** means a **motor vehicle** which is
    a.  Not insured by a **bodily injury** liability bond or policy at the time of the **accident.**
    b.  Insured by a **bodily injury** liability bond or policy at the time of the **accident** which provides coverage in amounts less than the amount of the claim for **damages.**
    c.  A hit-and-run vehicle whose operator or owner has not been identified and which causes **bodily injury** with or without contact to:
      (1) You or any **family member.**
      (2) A vehicle which you or a **family member are occupying.**
      (3) **Your insured car.**
    d.  Insured by a **bodily injury** liability bond or policy at the time of the **accident** but the Company denies coverage or is or becomes insolvent.

[*Id.* at 11].

### Porter's April 22, 2007, Car Accident

8.  On April 22, 2007, plaintiff was involved in an auto accident while driving the 1993 Volkswagen.  [Dkt. #10, Amended Complaint, ¶5; Dkt. #99, Ex. 10, Collision Report.]

9.  The accident was investigated by Oklahoma State Highway Patrol Trooper Brian Rose, who completed a Collision Report.  [Dkt. #99, Ex. 10, Collision Report and Ex. 11, Brian Rose Dep., 7:13-8:11, 17:2-10].  The Collision Report is dated April 24, 2007—two days after the accident.

10.  Rose was deposed in this case on June 28, 2011.  [Dkt. #99, Ex. 11, p. 1].  Based on his investigation, Rose concluded plaintiff's vehicle left the roadway on a curve, traveled 160 feet, struck a tree and went airborne, rolling 1 ¾ time on its drivers side .  [Dkt. #99, Ex. 10 at p. 4; Ex. 11, 13:2-14:20].

11.  After he completed his investigation, Rose went to St. John Medical Center in Tulsa, where he located plaintiff in the emergency room.  [Dkt. #110, Ex. 11, 17:20-18:13].  Rose

testified plaintiff appeared to be disoriented and could not speak coherently.  [*Id.,* 18:14-19:5].

The trooper testified he did not recall what, if any information, he had gotten from plaintiff, but

he did not believe he had gotten any information about how the accident occurred.  [*Id.,* 19:9-

17].  He testified that normally, he states in the collision report how an accident occurred, but

since the collision report on this accident contained no such information, he believed he was not

given any information about how it occurred.  [*Id.,* 19:25-20].

     12.  In an affidavit dated May 4, 2011 (before his deposition), Rose stated:

> I met with Mr. Porter on April 24, 2007, at St. John's Hospital and took his statement
> regarding the accident. … Mr. Porter advised that he was coming around the curve,
> and another vehicle had come into his lane of traffic and he swerved to miss the guard.

[Dkt. #111, Ex. 6, Brian Rose Affid., ¶¶3-4].[1]

     13.  However, Rose testified in his deposition that if he had been contacted by any

representative of the insurance company after he interviewed plaintiff, he would have told the

representative only one vehicle was involved in the accident.  [Dkt. #99, Ex. 11, Rose Dep.,

23:1-11].

     14.  Plaintiff was treated for his injuries at St. John Medical Center from April 24, 2007

to May 2, 2007. [Dkt. #99, Ex. 12, Medical Records].    The medical records from St. John

indicate plaintiff had been found in a house wandering around confused and disoriented and "it

appear[ed] that he had a motor vehicle accident two days before.  Apparently, he came to his

---

[1] Rose was deposed on June 28, 2011.  Plaintiff obtained his affidavit on May 4, 2011.  The
affidavit and the deposition conflict regarding whether plaintiff told Rose about another vehicle.
However, keeping in mind that the important issue is when and what the insurance company
knew about a phantom driver, it is important to note that the Collision Report itself does not
mention another vehicle, and Benson—the attorney Farmers hired to investigate plaintiff's
claim—testified when she interviewed Rose, he told her that although he could not be 100
percent certain since he had not witnessed the wreck, in his professional opinion no other
vehicles had been involved.  [See Fact #39, *supra*].

consciousness but was still confused and wandered into a local house.  He was transferred here."
[*Id.* at 57 of 108].  Plaintiff's mother, who had not seen him in three years, was with him at the
time.  Under "Past Medical History," the report states:  "Poor to obtain.  The patient is not able to
give a history."  [*Id.*].  The report noted plaintiff had swelling and abrasion on the right side of
the face, he was unable to move his right eye and examination of the orbit revealed "corneal
opacification, possible disruption."  [*Id.*].  A CT of the brain showed "punctate contusions" and a
"right zygomatic arch fracture, nondisplaced," and fractures of the right maxillary, the frontal
sinus on a fight orbital roof and nasal bone.  [*Id.* at 58 of 108]. In a record from OU Physicians –
Internal Medicine, the "History of Present Illness" states:

> Pt is a 42yo WM was involved in a MVA (motor vehicle accident) in 04/2007 with
> some unknown circumstances.  Pt states that he remembers driving his vehicle that
> night then doesn't remember anything else until the hospital 2 days later. …

[*Id.* at 60 of 108].

15.  In his EUO on November 11, 2009, plaintiff testified he had no memory of being at
St. John Medical Center two days after the accident or of his release from the hospital.  [Dkt.
#99, Ex. 5, EUO, 99:17-25].  He testified he had no memory of talking with an investigating
trooper.  [*Id.,* 121:15-17].  However, he also testified in the EUO he remembered that on the day
of the accident, "somewhere down the road"  that he "was trying to kind of get out of the way of
a truck, there was a—it was either gray or silver, and I cannot swear to the color, I just remember
it being a gray or silver, and it kind of come across center, which happens a lot on that little
road."  [Dkt. #111, Ex. 3, EUO, 26:2-12].  Plaintiff testified:

> [I]t came across the center median, and the last thing I remember, I kind of just
> moved over to correct just to get out of his way a little it, because he had, like, a—
> I don't know if it was what you call a trailer, but he had a trailer on the back, it
> could have been a oil lease guy, could have been somebody painting, you know,
> anything.  I don't know, and I just moved over, and that was the last thing I
> honestly remember.

[*Id.,* 26:13-23].  Plaintiff testified he moved over closer to the right-hand shoulder "to correct to

give it some distance."  [*Id.,* 27:17-20].  He did not remember his right side tire going off the

roadway at all.  [*Id.,* 27:21-23].

### Post-Accident Calls to Agent

16.  Plaintiff apparently called the Lehrman Agency in 2008.  [Dkt. #99, Ex. 6, T.

Lehrman Dep., 21:5-15].  Timothy Lehrman testified that in early 2008:

> Mr. Porter made a call to the office.  Not knowing who he was or not—none of
> us knew who he was, never identified himself.  It was crazy talk.  The only thing
> he said was it was an accident and it was in a tree and something about an injured
> eye. … There was babble talking on the other end about what I just said, there was
> an accident, there was an eye injury, and there was a tree involved.  That's all I
> know.

[*Id.,* 21:16-25, 23:1-4].  Lehrman testified he did not ask the caller who he was and did not say

anything to him, and the caller hung up.  [*Id.,* 23:5-10].  Lehrman testified, "I don't recall how

many of these crazy phone calls, but there were a couple of them—a few of them maybe."  [*Id.,*

24:21-23].  Lehrman testified the caller did not tell him that another vehicle was involved, nor

did Lehrman ask whether another vehicle was involved. [*Id.,* 33:18-23].[2]

17.  Cindy Fortney, another customer service representative at the agency recalls two

conversations with plaintiff.  The first phone call occurred "somewhere in 2008, maybe first part

of," although at the time she did not know it was Porter. [Dkt. #99, Ex. 7, Cindy Fortney Dep.,

34:11-22].  She testified that "a male voice was on the other end of the phone, it was a mumbled

---

[2] In his deposition, plaintiff testified he told either the insurance people or his lawyer about
another vehicle being on the road.  [Dkt. #111, Ex. 1, Porter Dep., 75:3-25].  It is unclear *when*
he told either the insurance people or his lawyer about the other vehicle.

or a—kind of a crazy conversation on his end where all I can remember is that he said he woke up in a house and had bugs on him."  [*Id.,* 35:2-11].[3]

18.   She testified that in 2009 "I received a call from Mr. Porter, he told me it was Mike Porter and that he needed a copy of his auto policy for the Volkswagen." [*Id.,* 36:7-11].  Plaintiff did not tell her he had been in a wreck.  [*Id.,* 36:12-13].  Fortney testified:

Q:   What else did he say besides he needed a copy of the auto policy for the Volkswagen?

A:   That was it, until I pulled up on the computer screen, I said that I have a '72 for a pickup, and he told me that he had called into the office and changed it from the Ford to the Volkswagen.[4]  At that point, I went to the client notes—ECMS, where I found a note, which was the last entry, that said that a car change had been made to the Volkswagen, and Tim's initials were next to it.

Q:   Now are you quite certain that Mr. Porter used the exact words, "I changed it from the Ford to the Volkswagen?

A:   Absolutely positive.

[*Id.,* 36:14-37:3].  Porter did not tell Fortney he had been involved in an accident or had been injured, and Fortney did not know he had.  [*Id.,* 37:21-38:2].  Porter did not say anything to Fortney about making a claim, nor did he inquire about UM coverage.  [*Id.,* 46:7-9, 46:16-18].

19.   Fortney first learned that plaintiff had been in an accident and sustained injuries after his attorney reported a claim to Farmers in August of 2009.  [*Id.,* 38:3-6].

---

[3] Fortney testified she realized the call was from plaintiff later after a claim had been filed with Farmers and assigned to Gilpin, because of references to plaintiff waking up in a house with bugs all over him.  [*Id.,* 35: 17-23]

[4] Porter told Fortney that Tim Lehrman had sent him a security verification for the Volkswagen, and Porter faxed a copy of it to Fortney.  [Dkt. #99, Ex. 7, 40:19-21, 44:20-25].  Apparently, Porter obtained a copy of his security verification from the Hominy Tag Office.  [Dkt. #111, Ex. 1, Porter Dep., 89:24-90:4; Ex. 5, Security Verification].

20.   Gary Lehrman testified that if a customer wants his agency to file a claim with Farmers, the agency will file a claim or refer the customer to the Farmers claims department. [Dkt. #99, Ex. 13, Gary Lehrman Dep., 51:9-16].  The agency has no notes or evidence that plaintiff was referred to the claims department.  [*Id.,* 51:21-24].  Gary Lehrman had no phone conversations directly with plaintiff after the accident, but is aware that a person later identified to be plaintiff called and spoke with Timothy Lehrman after the accident.  [*Id.,* 32:11-7, 32:19-33:18].

## Claim Submission

21.   On August 4, 2009, plaintiff's attorney, Jessika Tate, wrote to Farmers and made a UM claim on plaintiff's behalf.  [Dkt. #99, Ex. 14, Trisha Gilpin Affid., ¶2 and Ex. 1a thereto]. Tate's letter stated, "We represent [Porter] in regards to personal injuries sustained as a result of a car collision with an uninsured motorist on or about April 22, 2007."  [*Id.,* Ex 1a].   The letter referenced a security verification and stated, "As soon as possible, please advise of your UM policy limits and/or provide us with a copy of our client/your insured's UM rejection form." [*Id.*].  The letter did not provide details of the accident.  [*Id.*].

## Claim Investigation

22.   On August 7, 2009, Farmers assigned adjuster Trisha Gilpin to handle plaintiff's UM claim.  [Dkt. #99, Ex. 14, Gilpin Affid., ¶¶1, 3].

23.   On August 7, 2009, Gilpin reviewed the coverage provided by plaintiff's policy. Based upon the policy information available to her, it appeared that as of the date of the accident, plaintiff's only insured vehicle was the truck and that he had not purchased UM or med pay coverage.  [*Id.,* ¶4].  To verify that the truck policy did not provide UM coverage, Gilpin called the agent's office and requested the UM rejection form on the truck.  [*Id.,* ¶5].  She also called

Tate on August 7, 2009 and advised her that plaintiff's policy did not appear to provide UM or med pay coverage.  [*Id.*].

24.  On August 10, 2009, the agent's office provided Gilpin with a UM rejection form dated December 22, 2003, for plaintiff's policy number 08-161758493.  [*Id.,* ¶6 and Ex. 2a, UM Rejection Form].

25.  On August 11, 209, Gilpin wrote to Tate and advised her that it did not appear that plaintiff had elected UM coverage on any of the vehicles in his household.  [*Id.,* ¶7 and Ex. 3a thereto, August 11, 2009 Letter from Gilpin to Tate].  Gilpin provided her with a copy of the December 22, 2003, UM rejection form.  [*Id.*].

26.  On August 17, 2009, Gilpin received a letter from Tate in which Tate asked Gilpin to provide Tate with a UM rejection form signed by plaintiff after he added a new vehicle to the policy on or about January 29, 2007.  [*Id.,* ¶8 and Ex. 4a thereto, August 17, 2009 Letter from Tate].  Citing 36 O.S. § 3636(H)(2), Tate stated:

> Mr. Porter added a new vehicle on the above referenced policy on or about **1/29/07**, so a new UM rejection form is required.  Thus, we request you immediately send us a copy of the UM rejection form dated after **1/29/07**.
>
> If you are unable to find this UM rejection form, we request that you immediately in good faith provide our client/your insured with UM coverage on the above-referenced policy.

[*Id.,* Ex.4a].

27.  On August 17, 2009, Gilpin told Tate that Farmers did not write multi-car policies in January of 2007.  Therefore, if plaintiff had requested coverage on the Volkswagen as an additional vehicle instead of a replacement vehicle, Farmers would have written a completely separate policy for the Volkswagen.  Farmers would not have added the Volkswagen to plaintiff's existing policy on the truck.  [*Id.,* Ex. 14, ¶9].

28.  The same day, Gilpin called the agent's office and spoke to a Customer Service Representative ("CSR"), who told her that plaintiff asked to change coverage from the truck to the Volkswagen.  [*Id.,* ¶10].

29.  On August 18, 2009, Gilpin reviewed Lehrman's notes regarding coverage on the Volkswagen.  The notes indicated that plaintiff wanted to substitute the Volkswagen for the insured vehicle, the truck.  [*Id.,* ¶11].

30.  On August 18, 2009, Gilpin telephoned Tate and left her a voice mail message requesting that plaintiff provide a recorded statement.  [*Id.,* ¶12].

31.  The same date Gilpin spoke with Lehrman regarding coverage on the Volkswagen. Lehrman advised Gilpin that his notes indicated plaintiff wanted to substitute, not add, the Volkswagen on the policy.  [*Id.,* ¶13].

32.  On August 19, 2009, Gilpin wrote Tate requesting plaintiff's statement, which was then taken on August 21, 2009.  [*Id.,* ¶14 and Ex. 5a (letter to Tate); Ex. 3, 8/21/09 Recorded Statement of Porter].

34.  In his recorded statement, plaintiff stated that he intended to add the Volkswagen as an additional insured vehicle on his policy, and that he had not intended to substitute the Volkswagen for the truck.  [*Id.,* Ex. 3 at p. 4].

35.  In his recorded statement, plaintiff did not state that another vehicle was involved in the accident and Gilpin did not ask whether another vehicle had been involved.  Plaintiff stated:

TG:     Okay. And if you will describe for me what happened?

MP:     I really can't tell you, I don't know.  I was recovered by medical or the fire department and go away with the ambulance found in the roadway after being there a few days.

TG:     Okay.  So, you don't recall anything from the date of your accident?

MP:     Uh, honestly no, I don't.  I wish I did to tell you the truth.

[*Id.*, Ex. 3 at p. 8].  Plaintiff also stated he did not remember if he had ever made a report of the accident to the insurance company before August 2009.  [*Id.* at p. 12].  Asked if he had an explanation as to why he would have waited two years to report the accident, he responded, "Not really no, I mean, it just…been through an lot" and "It's hard, you know."  [*Id.* at 13].

36.  Plaintiff admitted in his deposition that when the recorded statement was taken on August 21, 2009, he still did not remember how the accident happened.  [Dkt. #99, Ex. 4, Porter Dep., 72:4-18].

37.  On August 25, 2009, Gilpin retained the law firm of Edmonds, Cole to represent Farmers in connection with plaintiff's UM claim.  [Dkt. #99, Ex. 14, ¶17].

38.  By letter to Tate dated September 2, 2009, Sheila Benson, an attorney with Edmonds, Cole, requested plaintiff's EUO.  [Dkt. #99, Ex. 15, Sheila Benson Affid., ¶3].  Benson also asked Tate to provide her with plaintiff's medical records and bills or, in the alternative, for plaintiff to sign a medical authorization and provide her with a list of treating providers.  [*Id.*].  In a phone conversation between Benson and Tate on September 8, 2009, Tate agreed plaintiff would appear for his EUO in late October, 2009, so that Benson would have time to gather medical records.  Tate agreed to provide Benson with a medical authorization signed by plaintiff and a list of his medical providers.  [*Id.,* ¶5].

39.  On September 2, 2009, Benson contacted Oklahoma Highway Patrol Troop K to schedule a meeting with Trooper Rose.  [*Id.,* ¶4].  On September 8, 2009, Benson spoke with Rose and scheduled a meeting for September 14, 2009.  [*Id.*].  Benson met with Rose on September 14, 2009.  Rose advised Benson that he went to the hospital to speak with plaintiff about the accident, but that plaintiff did not, and could not, provide any information about how

14

the accident happened.  [*Id.,* ¶6].  Bensen testified in her deposition that Rose told her "he

couldn't say 100 percent because he wasn't there when the event happened,"  but "in his

professional opinion in the accident he had investigated that another vehicle was not present."

[#99, Ex. 16, Sheila Benson Dep., 34:3-10]. In his deposition on June 28, 2011, Trooper Rose

admitted that his memory might have been better in September 2009, when he spoke with

Benson, than on February 22, 2010, when he spoke with counsel for plaintiff, George Mullican.

[Dkt. #99, Ex. 11, Rose Dep., 55:24-56:7].

    40.  On September 15, 2009, Tate provided Benson with a medical authorization signed

by plaintiff and a list of his medical providers.  [Dkt. #99, Ex. 15, Bensen Affid., ¶7].

    41.  By letter dated September 21, 2009, Benson advised Tate that she had received the

medical authorization and list of providers on September 16, 2009, and she confirmed their

agreement to schedule plaintiff's EUO in late October.  [*Id.,* ¶8].

    42.  On September 24, 2009, Benson traveled to Tulsa to meet with Gary and Timothy

Lehrman regarding the agency's communications with plaintiff, and specifically whether

plaintiff requested a second policy of insurance on his Volkswagen in January of 2007.  [*Id.,* ¶9].

Timothy Lehrman told Benson plaintiff asked to substitute—not add—the Volkswagen.  [*Id.*].

    43. On October 20, 2009, Benson and Tate agreed to schedule Porter's EUO for

November 11, 2009. [*Id.,* ¶].  On November 11, 2009, plaintiff's EUO was taken.  [*Id.,* ¶¶10-11].

    44.  During the EUO of November 11, 2009, plaintiff, for the first time, reported to

Farmers that the accident was caused by another motorist.  [Dkt. #99, Ex. 5, EUO, 32:15-33:24;

82:2-83:24; Ex. 14, Gilpin Affid., ¶19].

    45.  In his deposition, plaintiff testified that before his EUO, he believes he told either the

"insurance people" (but not Gilpin) or his lawyer that another vehicle had been on the road.  [*Id.,*

15

75:3-25].  Plaintiff also testified, "I have a memory telling somebody pertaining to Farmers Insurance that—that I had an idea that there was another vehicle.  But I wasn't sure if it was a memory or like a dream or—I wasn't sure until later that it started coming back to me I started having some pretty strong…"  [Dkt. #99, Ex. 4, Porter Dep.*,* 86:25-87:4].

46.  Prior to his EUO, plaintiff had not told anyone at Farmers that another vehicle was involved in or caused the accident.  [Dkt. #99, Ex. 14, Gilpin Affid., ¶19; Ex. 6, T. Lehrman Dep., 21:16-24; 33:18-21; Ex. 7, Fortney Dep., 34: 11-35:2; 36:9-24; 37:21-38:6 ; 46:7-18 ].

47.  On November 18, 2009 and December 1, 2009, Benson received additional medical records and bills regarding plaintiff's treatment.  [Dkt. #99, Ex. 15, Benson Affid., ¶12].

48.  On December 18, 2009, Benson provided her opinions to Farmers regarding plaintiff's UM claim.  [Dkt. #99, Ex. 17, 12/18/09 Letter from Benson to Gilpin].  In the letter, Benson advised that because there was an issue of fact whether Porter had asked the agent to replace the Volkswagen for the truck on an existing policy or had requested separate coverage for the Volkswagen, and Farmers' agent had not obtained a UM waiver for the Volkswagen, the $25,000 statutory minimum UM benefits could potentially be imputed to the insurance policy (as provided by 36 O.S. § 3636 and applicable case law), and Farmers should pay the statutory minimum to plaintiff for his bodily injuries from an  uninsured motorist.  [*Id.*].

49.  On December 24, 2009, Gilpin called Tate to advise her that Farmers would extend UM coverage to plaintiff with a $25,000 limit.  [Dkt. #99, Ex. 14, ¶21].  Gilpin was unable to reach Tate, and left her a message.  [*Id.*].

50.  As of December 31, 2009, Gilpin had not heard back from Tate, so she called again, and advised her that Farmers was extending UM coverage to plaintiff with a $25,000 limit.  [*Id.,* ¶22].

51.  On January 4, 2010, Gilpin again called Tate and advised her that Farmers would pay plaintiff $25,000 in UM benefits for the accident.  [*Id*., ¶23].

52.  Plaintiff admitted in his deposition that Farmers offered him the UM policy limit less than two months after his EUO testimony that another vehicle was involved in the accident. [Dkt. #99, Ex. 4, Porter Dep., 89:8-13].

53.  Farmers contends its agreement to pay plaintiff UM benefits was not made pursuant to a policy of insurance issued by Farmers, but instead because (1) plaintiff claimed the agent should have obtained a UM rejection in connection with coverage for the Volkswagen and (2) based on plaintiff's EUO testimony, there was some evidence that another vehicle caused the accident.  [Dkt. #99, Ex. 18, Defendant's Answer to Interrogatory No. 5].

54.  When Gilpin called Tate on January 4, 2010, Tate advised Gilpin that she needed to determine the amount of Medicare's subrogation interest and the amount of the child support lien against plaintiff before Farmers issued payment.  [Dkt. #99, Ex. 14, Gilpin Affid., ¶23].  Farmers was always willing to issue a single check with Medicare listed as a payee, but plaintiff's counsel rejected that proposal.  [*Id.,* ¶27].

### Claim Payment

55.  By letter dated January 7, 2010, Tate provided Gilpin with an authorization allowing Medicare to provide Farmers with the amount of its subrogation claim. [*Id.,* ¶24].

56.  On January 14, 2010, Gilpin sent the Medicare authorization to Medicare and requested the amount of Medicare's claim.  [*Id.,* ¶26].

57.  Plaintiff filed this action on February 24, 2010.  [Dkt. #2].

58.  On July 20, 2010, plaintiff's counsel, Adrienne Cash, sent a letter to Medicare Coordination of Benefits office with a Medicare Secondary Payer Development form.  [Dkt. #99, Ex. 19, 7/20/10 Letter from Cash to Medicare].  This was Cash's first correspondence to Medicare.  [Dkt. #99, Ex. 20, Cash Dep., 36:16-37:7].

58.  On November 9, 2010, Medicare wrote to Cash and advised that Medicare had not paid any claims related to plaintiff's incident of "10/01/09."  [Dkt. #99, Ex. 21, 11/9/10 Letter from Medicare to Cash].  Medicare further stated it could not determine the final amount of its lien until Cash submitted a Final Settlement Detail document form.  [*Id.*].

59.  When Cash received Medicare's November 9, 2010 letter, she had all of the information she needed to fill out the Final Settlement Detail document requested by Medicare.  [Dkt. #99, Ex. 20, Cash Dep., 42:3-7].  Cash admits that the amount of Medicare's lien could not be determined until she received a final demand letter from Medicare, after the Final Settlement Detail document was submitted.  [*Id.,* 38:16-25].

60.  On December 1, 2010, Cash wrote to Farmers' counsel, Robert Taylor, and requested that Farmers issue payment of the UM proceeds.  [Dkt. #99, Ex. 22, 12/1/10 Letter from Cash to Bibb].  Cash attached the November 9, 2010, letter from Medicare.  [*Id.*].

61.  On February 7, 2011, defense counsel Ashley Bibb emailed Cash regarding the status of the Medicare issue.  [Dkt. #99, Ex. 23, 2/7/11 Email Exchange].  Specifically, Bibb inquired regarding the status of the submission of the Final Settlement Detail document.  [*Id.*]. Cash responded, "We sent it all.  Just awaiting information.  I'll have my paralegal call again."  [*Id.*].

62.  In reality, Cash had not sent the Final Settlement Detail document to Medicare and she failed to do so until April 6, 2011.  [Dkt. #99, Ex. 24, 4/6/11 Letter from Cash to Medicare;

Ex. 21, Cash Depo., 42:8-43:18].[5]   The caption of the cover letter for the Final Settlement Detail

indicates that the "date of incident" was "10/01/09."  [Dkt. #99, Ex. 24].  The letter asked

Medicare to process the Final Settlement Detail document and provide her office with the

amount of Medicare's claim.  [*Id.*].

    63. At a hearing before Magistrate Judge Paul Cleary on April 25, 2011, Cash admitted

that the November 9, 2010, letter from Medicare was not useful to resolve the Medicare issue,

and that the incorrect incident date of October 1, 2009, confused the parties' counsel.  [Dkt. #99,

Ex. 25, CD of 4/15/11 Hearing].

    64.  Cash admitted that, as of April 2011, the Medicare issue was unresolved and that she

did not want settlement checks issued.  [Dkt. #99, Ex. 20, Cash Dep., 10:5-19].  She agreed that,

at the time, she was still waiting on a final demand from Medicare.  [*Id.,* 10:20-11:5].  She

intended to request settlement checks when she received Medicare's final demand letter.  [*Id.,*

12:3-15].

    65.  By letter dated July 15, 2011, Medicare advised Cash that it had not made payment

related to the "October 1, 2009" "date of incident," and the Medicare was closing its file.  [#99,

Ex. 26, 7/15/11 Letter from Medicare to Cash].

    66.  On July 20, 2011, Cash sent Medicare's July 15, 2011, letter to Bibb.  [Dkt. #99, Ex.

27, 7/20/11 Email from Cash to Bibb].  Cash advised Bibb she thought that once the current

amount of the child support lien was obtained, the UM check could be issued.  [*Id.*].

    67.  On July 21, 2011, Bibb advised Cash that the incorrect accident date on Medicare's

correspondence concerned her.  [Dkt. #99, Ex. 28, 7/21/11 Email from Bibb to Cash].  Bibb

---

[5] Based on her testimony, it appears Cash represented to Bibb that the final settlement detail had
been sent to Medicare because she "had been advised that it had been provided" earlier.  [*Id.,*
42:21-25].

requested that Cash ask Medicare for a letter referencing the April 22, 2007 accident date, to clarify that Medicare was not asserting a lien.  [*Id.*].

68.  On July 22, 2011, Cash responded that Medicare told her that plaintiff did not become eligible for Medicare benefits until October 1, 2009, so the July 15, 2011 letter was all that Medicare could provide.  [*Id*].  Cash asked Bibb to let her know if Farmers needed something more specific.  [*Id.*].

69.  Cash and Bibb then discussed Farmers' request for correspondence from Medicare referencing the correct accident date.  [Dkt. #99, Ex. 20, Cash Dep., 16:11-25].

70.  On July 28, 2011, Cash emailed Bibb a proposed letter to Medicare requesting confirmation from Medicare that it was not asserting a subrogation claim arising from the April 22, 2007, accident.  [Dkt. #99, Ex. 29, 7/28-29/11 Email Exchange Between Cash and Bibb].  Bibb authorized Cash to send the letter to Medicare.  [*Id.*].

71.  According to Cash, the July 28, 2011, letter to Medicare would have been sent to Medicare via facsimile.  [Dkt. #99, Ex. 20, Cash Dep., 18:3-5].  Cash cannot locate a fax confirmation sheet showing that the July 28, 2011, letter was actually faxed to Medicare.  [Dkt. #99, Ex. 30, 10/25/11 Email from Cash to Bibb].

72.  By letter dated July 27, 2011, Medicare wrote to Cash and referred Cash to its July 15, 2011, letter.  [Dkt. #99, Ex. 31, 7/27/11 Letter from Medicare to Cash].  Bibb was not provided with a copy of this letter until Cash's deposition on October 4, 2011.  [Dkt. #99, Ex. 32, Ashley Bibb Affid., ¶2].  Cash agrees that she has no evidence that she provided this letter to Bibb prior to that time.  [Dkt. #99, Ex. 30, 10/25/11 Email form Cash to Bibb].

73.  On September 6, 2011, Bibb, assuming that Cash's July 28, 2011, letter had been sent to Medicare, emailed Cash and inquired regarding whether Medicare had responded to the

July 28, 2011, letter.  [Dkt. #99, Ex. 33, 9/6/11 Email Exchange Between Cash and Bibb].  Cash advised that Medicare had not responded.  [*Id.*].

74.  Cash asserts that she asked Farmers to issue the settlement checks at the settlement conference on September 14, 2011.  [Dkt. #99, Ex. 20, Cash Dep., 22:18-24].

75.  On October 20, 2011, Farmers issued payment of the UM proceeds.  [Dkt. #99, Ex. 34, 10/20/11 Letter from Cheryl Terry to Cash].  Farmers contends that, as of that time, Farmers had still not received confirmation from Medicare that it was not asserting a claim to the UM proceeds paid as a result of the April 22, 2007 accident.  [Dkt. #99, Ex. 35, Cheryl Terry Affid., ¶2].  Therefore, Farmers included Medicare as a payee on the settlement check.  [*Id.*].  Plaintiff asserts that "Farmers was in possession of all documentation received from Medicare indicating that there was no subrogation interest," and further, "Farmers was in possession of an authorization which permitted it to contact Medicare if it still had questions, but failed to do so before choosing to include Medicare as a payee, thereby further delaying payment."  [Dkt. #111 at 21-22, ¶96].

76.  On October 25, 2011, Cash provided Bibb with a copy of her letter to Medicare of the same date.  [Dkt. #99, Ex. 36, 10/25/11 Letter from Cash to Bibb].  In her letter to Medicare, Cash confirmed her assistant's conversation with Medicare that it would take eight or more weeks for Medicare to process the settlement check.  [*Id.*].  Cash asked Medicare to '[p]lease confirm that my understanding of the process is correct and that Medicare is not making a claim arising from the April 22, 2007, accident."  [*Id.*].

77.  During a recorded phone call among Cash, Bibb and Medicare on October 31, 2011, a Medicare representative verbally represented that Medicare was not asserting a subrogation claim arising from the April 22, 2007, accident.  Based upon this representation, on November 4,

2011, Farmers issued a check for the UM proceeds that did not name Medicare as a payee.  [#99, Ex. 35, Terry Affid., ¶2].  The check was sent to Cash on November 8, 2011.  [Dkt. #99, Ex. 36, 11/8/11 Letter from Robert Taylor to Cash].

### Alleged Deficiencies in Farmers' Policies and Practices

78.  Plaintiff asserts that "Farmers has a policy that encourages agents not to turn in losses as the compensation of the agent is dependent on amounts paid in claims." [Dkt. #99, Additional Material Fact #12.].  This assertion is based on testimony by  Gary Lehrman that an agent's profitability is determined based on losses (from claims paid) versus premiums paid, the lower the claims made versus premiums in a year, the higher the bonus the agent gets, and in the past  he has not gotten  a bonus because of the percentage of loss ratios by his insured.  [Dkt. #99, Ex. 4, Gary Lehrman Dep., 53:20:54:3, 55:10-14].  It is undisputed that the Lehrman Agency did not initiate a claim after plaintiff's call to Fortney. [See ¶¶17-19, above].

79.  Fortney testified that neither Lehrman Agency nor Farmers provided any training to agents on giving insureds with claims coverage opinions, claim adjustment, or claim investigaton, or what to do when an insured tells them he has been in an accident.  [Dkt. #111, Ex. 9, Fortney Dep., 29:5-30:16].[6]  Fortney testified Farmers had provided her training on how to sell a life insurance policy.  [*Id.,* 20:1-7].  Farmers does not conduct audits of the agent's files to ensure proper handling.  [Dkt. #111, Ex. 4, Gary Lehrman Dep., 83:5-14].

80.  Plaintiff's expert, Diane Luther,[7] contends:

---

[6] However, Fortney testified plaintiff did not tell her he had been in an accident; he only asked about coverage for the Volkswagen.  [See ¶18, above].

[7] Defendant filed a *Daubert*  motion with respect to Luther's expert testimony.  It is apparent from a review of Luther's opinion that some of her conclusions clearly conflict with the undisputed facts.  For example, she states, "With respect to the delay in the investigation, Farmers captive agent was notified by Mr. Porter on two occasions, in early 2008, about the

- Gilpin's investigation was inadequate because she failed to ask Porter specific questions about the accident and failed to speak with the investigating officer. Gilpin testified she knows the presence of a second vehicle is a requirement to trigger UM coverage.

- The training of Farmers' adjusters is inadequate.

- Instead of investigating the claim itself, Farmers hired an attorney "at considerable expense" to begin the investigation.[8]

- Farmers "forced Porter, who was cooperating," to an unnecessary EUO (because based on plaintiff's recorded statement Farmers had everything it needed to make its coverage decision).

- "Finally, Farmers admitted error and accepted the claim on January 4, 2010."

- However, Farmers "continued to delay payment until November 4, 2011."

- During the delay, Farmers, through its attorneys "refused to accept verification that Medicare did not have any subrogation interest, despite correspondence form Medicare and representations from Porter's counsel."[9]

[Dkt. #111, Ex. 10].

---

claim." [Dkt. #111, Ex 10 at 2]. It is undisputed that when Porter called the agency in 2008, he did not identify himself and the customer service representatives did not—at the time—know the identity of the caller. Despite the conflicts, the court does not believe it necessary to resolve the *Daubert* issue prior to ruling on defendant's Motion for Summary Judgment.

[8] The expert opines, "All in all, Farmers action created an unreasonable delay in getting Mr. Porter paid the UM benefits. Farmers should have known within 30 days of its notice of claim, what it knew when it paid the claim in December 2009 had its adjuster been competent." [#111, Ex. 10 at 2.]

[9] The expert opines, "As of July, 2011, Farmers was notified by Medicare that it did not have an interest in the proceeds of the policy benefits at issue in this case," and its failure to pay at that time "is improper and does not meet acceptable insurance industry standards." [#111, Ex. 10 at 2].

### Porter's Damages

81.  Before the accident, Porter was employed full time as a metal fabricator and a volunteer fireman.  [Dkt. #111, Ex. 1, Porter Dep., 23:20-24:4; 11:6-20].

82.  Porter testified that as a result of the delay in receiving insurance proceeds "there's a lot of recovery that I couldn't do, therapy, stuff the state wasn't going to pay for," because "Medicaid or Medicare only pays for certain stuff," and "[t]here's a whole lot of things that I could have used this money to better myself and to get my life back together and maybe have my kids back in my life, straighten my life back up, to get it back where it was."  [*Id.,* 91:20-92:3]. Plaintiff's brief also asserts, "Porter has sustained emotional distress due to the actions of Farmers," although there is no evidentiary cite.  [Dkt. #111 at 26, Plaintiff's Statement of Additional Fact #32].

### II. Analysis

### A.  Breach of Contract Claim

Farmers argues that since it did not issue any policy that provided UM coverage and never collected any premiums for UM coverage, plaintiff has no viable claim for breach of an insurance contract.  Rather, plaintiff was entitled to UM benefits, if at all, only if Farmers failed to obtain a signed UM waiver when it was required to obtain one.

Rights of recovery under the Uninsured Motorist Act, 36 O.S. § 3636, are governed by the statute in effect on the date of issuance or last renewal of the policy against which an uninsured motorist claim is made.  *Cofer v. Morton,* 784 P.2d 67, 70 (Okla. 1989).[10]  The version of the statue in effect at that time (January 2007) provided:

---

[10] In her opinion letter, attorney Benson used the date of January 2007, when Porter contacted Timothy Lehrman.  The version of § 3636(G) and (H) relied upon by Benson was in effect from 1990 until 2009.

G. A named insured or applicant shall have the right to reject uninsured motorist coverage in writing,  and except that unless a named insured or applicant requests such coverage in writing, such coverage need not be provided in or supplemental to any renewal, reinstatement, substitute, amended or replacement policy where a named insured or applicant had rejected the coverage in connection with a policy previously issued to him by the same insurer.

H.  Notwithstanding the provisions of this section, the following are the only instances in which a new form affecting uninsured motorist coverage shall be required:

1.  When an insurer is notified of a change in or an additional named insured;
2.  When there is an additional vehicle that is not a replacement vehicle; provided, A new form shall not be required for the addition, substitution or deletion of a vehicle from a commercial automobile liability policy; or
3.  When the amount of bodily injury liability coverage is amended.  Provided, any change in premium alone shall not require the issuance of a new form.

After selection of limits, rejection, or exercise of the option not to purchase uninsured motorist coverage by a named insured or applicant for insurance, the insurer shall not be required to notify any substitute, amended or replacement policy as to the availability of such uninsured motorist coverage or such optional limits.  Such selection, rejection or exercise of the option not to purchase uninsured motorist coverage by a named insured or an applicant shall be valid for all insureds under the policy and shall continue until a named insured requests in writing that the uninsured motorist coverage be added to an existing or future policy of insurance.

36 O.S. § 3636.  When an insurer fails to make a written offer of UM coverage and obtain a rejection of that coverage in writing, then the insured is automatically entitled to UM coverage in the minimum required statutory limits.  *May v. Natl Union Fire Ins. Co.,* 918 P.2d 43, 47-48 (1996).  That limit is (and was in 2007) $25,000 per person/$50,000 per occurrence.  36 O.S. § 3636(K).

In order to establish a claim for breach of contract, plaintiff must show (1) formation of a contract between plaintiff and defendant; (2) defendant breached the contract; and (3) plaintiff suffered damages as a direct result of the breach.  OUJI2d No. 23.1.  Farmers contends plaintiff

cannot establish even the first element—formation of a contract.  Rather, its obligation arises by operation of law.

Additionally, in both *Uptegraft v. Home Ins. Co.,* 662 P.2d 681, 685 (Okla. 1983) and *Wille v. Geico Cas. Co.,* 20 P.3d 888, 891-92 (2000), the Oklahoma Supreme Court has held that the statute of limitations for a claim against an insurer for UM coverage begins to run only when a breach of the insurance contract occurs.  In *Wille,* the court stated:

> A statute of limitations begins to run when a cause of action accrues.  This happens when a litigant can first maintain an action to a successful conclusion.  It does not commence until a plaintiff has a legal right to sue….The majority of the jurisdictions which have considered this question have decided that the recovery of the insured is premised upon the insurance contract without which  no liability could be imposed upon the insurer.  These court recognize that until a breach of the insurance contract occurs, there is no controversy under the contract upon which a party my sue.  We have crossed that bridge.  In *Uptegraft,* we held that the insurer's refusal to pay it's [sic] insured on a valid claim constituted a breach of contract.

20 P.3d at 891-92.  Farmers reasons, "The plain import of this ruling is that, unless a UM insurer is refusing to pay the insured, there is no 'controversy' to be litigated."

Plaintiff argues that his breach of contract claim arose when he tried to report the accident in early 2008.  However, to the extent a contract for UM coverage is imputed by law, Farmers offered to pay the statutory limit before suit was filed and has now paid the limit. Farmers is therefore entitled to summary judgment on Porter's breach of contract claim.

### B. Bad Faith Claim

Plaintiff contends Farmers acted in bad faith in three respects:

1. Farmers' agent, Lehrman Agency, failed to turn in a claim when plaintiff contacted it in early 2009.[11]

---

[11] There is a fact issue whether plaintiff asked the agency to replace the truck with the Volkswagen on the existing policy, or to obtain a new policy.  However, the issue is not material to resolution of this case because Farmers—recognizing the potential that UM coverage could be imputed by statute based on the lack of a UM waiver—agreed to extend UM coverage for the

2. Once an attorney for plaintiff submitted a claim to Farmers, it failed to conduct a reasonable and timely investigation.

3. Once Farmers determined it would pay UM coverage statutory limits of $25,000 to plaintiff, it failed to tender payment in a reasonable and timely manner.

## A.  Applicable Law

In *Christian v. American Home Assurance Co.,* 577 P.2d 899, 904 (Okla. 1977), the Oklahoma Supreme Court found that an insurer has a duty to deal fairly and in good faith with its insured, and a violation of that duty gives rise to an action in tort for consequential and, possibly, punitive damages.  A "clear showing" that the insurer acted unreasonably and in bad faith is necessary to show a breach of that duty.  *Id.* at 905.

An insurer's refusal to pay is not unreasonable or in bad faith when there is a legitimate dispute concerning coverage.  *Andres v. Oklahoma Farm Bureau Mut. Ins. Co.,* 227 P.3d 1102, 1107 (Okla. Civ. App. 2009) (citing, *inter alia, Christian*).  "The decisive question is whether the insurer had a good faith belief, *at the time its performance was requested, that it had justifiable reason for withholding payment under the policy.*"  *Duensing v. State Farm Fire & Cas. Co.,* 131 P.3d 127, 137-138 (Okla. Civ. App. 2006) (emphasis in original).  The insurer's "knowledge and belief … during the time period the claim is being reviewed is the focus of a bad faith claim." *Id.* at 138 (citing *Buzzard v. Farmers Ins. Co., Inc.,* 824 P.2d 1105 (Okla. 1991)).

An insurer may withhold payment from its insured whenever it has a reasonable defense to the insured's claim based on its knowledge and belief.  *Bailey v. Farmers Ins. Co.,* 137 P.3d 1260, 1264 (Okla. Civ. App. 2006) (citing *Manis v. Hartford Fire Ins. Co.,* 681 P.2d 760 (Okla. 1984)).  This includes when the insurer and insured have legitimate disputes over the amount of

statutory limit.  Thus, the focus of the case is whether and when Farmers and/or its agent should have known plaintiff had a claim for UM coverage.

coverage or the cause of loss. *Skinner v. John Deere Ins. Co.,* 998 P.2d 1219, 1223 (Okla. 2000).

"Where an insurer has demonstrated a reasonable basis for its actions, bad faith cannot exist as a

matter of law," and the insurer is entitled to summary judgment. *Beers v. Hillory,* 241 P.3d 285,

293 (Okla. Civ. App. 2010) (citing, *inter alia, Manis* at 761-62).

The Tenth Circuit stated the issue presented to a trial court on an insurer's motion for

summary judgment in a bad faith lawsuit as follows:

> A jury question arises only where the relevant facts are in dispute or where the
> undisputed facts permit differing inferences as to the reasonableness and good
> faith of the insurer's conduct.  On a motion for summary judgment, the trial
> court must first determine, under the facts of the particular case and as a matter
> of law, whether insurer's conduct may be reasonably perceived as tortious.  Until
> the facts, when construed most favorably against the insurer, have established what
> might reasonably be perceived as tortious conduct on the part of the insurer, the
> legal gate to submission of the issue to the jury remains closed.

*Oulds v. Principal Mutual Life Ins. Co.,* 6 F.3d 1431,1436-37 (10th Cir. 1993).

"When a bad faith claim is premised on inadequate investigation, the insured must make

a showing that material facts were overlooked or a more thorough investigation would have

produced relevant information." *Timberlake Constr. Co. v. U.S.F. & G. Co.,* 71 F.3d 335, 345

(10th Cir. 1995) (applying Oklahoma law).  The insurer's investigation does not need to be

perfect, but "reasonably appropriate under the circumstances." *Sims v. Great Am. Life Ins. Co.,*

469 F.3d 870, 891 (10th Cir. 2006) (quoting *Buzzard v. Farmers Ins. Co.,* 824 P.2d 1105, 1109

(Okla. 1991)).  "An investigation does not meet this standard where (1) the manner of

investigation hints at a sham defense or otherwise suggests that material facts were overlooked,

or (2) the insurer intentionally disregarded undisputed facts supporting the insured's claim." *Id.*

(citing *Oulds,* 6 F.3d at 1442).

Plaintiff asserts Farmers' handling of the claim violated the Unfair Claims Settlement

Practices Act ("UCSPA"), 36 O.S. § 1250.1 *et seq.*  A violation of the act does not give rise to a

private right of action.  *Thompson v. State Farm Fire & Cas. Co.,* 34 F.3d 932, 939 (10th Cir.

1994); *Gianfillippo v. Northland Cas. Co.,* 861 P.2d 308, 310 (1993).[12]

## B. Analysis

### 1. Agency's Failure to Turn in Claim

A basic requirement of UM coverage is that the insured is legally entitled to recover from

some other motorist.  36 O.S. § 3636.  Farmers' auto policy form, consistent with the UM

statute, only required it to pay UM benefits to plaintiff if he were injured by an uninsured

tortfeasor, an underinsured tortfeasor or an unidentified hit-and-run motorist.  Under Oklahoma

law, "an injured insured must demonstrate that the preconditions for loss under the uninsured

motorist coverage exist before he or she can recover under the primary uninsured motorist

coverage.  *Gates v. Eller,* 22 P.2d 1215, 1219 (Okla. 2001).

Plaintiff contends "[t]he bad faith conduct of Farmers began when Mr. Porter called his

agent's office in 2008 to advise of his accident and the agent did nothing to attempt to verify his

coverage or turn in a claim."  [Dkt. #111 at 30].   The court disagrees.  Although it is clear in

retrospect that anonymous calls in 2008 about a wreck were, in fact, made by Porter, it is

undisputed he was incoherent and did not identify himself, and the agency's customer service

representatives did not know his identity.  Further, it is undisputed that when Porter called the

---

[12] Section 1250.5 of the Act lists various unfair claim settlement practices. They include "[f]ailing to adopt and implement reasonable standards for prompt investigations of claims arising under its insurance policies or insurance contracts" and "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear."  36 O.S. § 1250.5 (3) and (4).  In *Beers,* 241 P.3d  at 294, the Oklahoma Court of Civil Appeals restated the principle that a violation of the UCSPA does not give rise to a private right of action, noting a breach of duty imposed by § 1250.5 is not a violation of the Act, nor does it necessarily establish bad faith.  However, the court stated "the UCSPA can provide the district court with guidance in determining whether particular conduct on the part of an insurer is unreasonable and sufficient to constitute a basis for a bad faith claim."  *Id.*

agency and talked to Fortney in early 2009, he only asked for a copy of his insurance policy and did not mention the accident.  Finally, Porter never told anyone at the agency about a phantom driver.

Plaintiff has failed to demonstrate the "preconditions for loss" under the UM coverage existed until his attorney wrote Farmers a letter on August 4, 2009.  *See Gates,* 22 P.2d at 1219. The agency did not act unreasonably in failing to turn in Porter's claim because Porter did not make them aware of either the wreck or the existence of a phantom driver.

### 2. Investigation of Claim

Plaintiff's attorney Jessika Tate sent Farmers a letter on August 4, 2009, making a claim on his behalf.   The agent provided the adjuster Gilpin with a signed waiver of UM coverage for the policy number listed on Tate's letter.  On August 11, 2009, Gilpin sent a copy of the waiver to Tate, advising her UM coverage had been waived and that she was closing the claim to inactive. Tate responded on August 27, 2009, stating that plaintiff added a new vehicle (the Volkswagen) to the policy on January 29, 2007, so a new UM rejection form was required under 36 O.S. § 3636(H)(2), and requesting that Farmers immediately send a copy of such rejection form or immediately provide Porter with UM coverage on the policy.  On August 18, 2009, Gilpin called Tate and asked to take a recorded statement from Porter and on August 21, 2009, the recorded statement was taken.  During the recorded statement, Porter said he did not remember what happened in the accident and did not remember if he ever reported the accident to the insurance company before August 9, 2009.  He admitted in his deposition during pendency of this lawsuit that at the time his recorded statement was taken, he did not remember how the accident happened.

On August 25, 2009, Gilpin retained attorney Sheila Benson to investigate Porter's claim. On September 2, 2009, Benson requested plaintiff's EUO and contacted the Highway Patrol to schedule a meeting with Trooper Rose.  On September 8, 2009, Benson and Tate discussed Benson's request to obtain medical records and agreed to do plaintiff's EUO in late October.  On September 8, 2009, Benson scheduled a meeting with Rose on September 14, 2009.  Benson met with Rose on September 14, 2009, and Rose told her that in his professional opinion no other vehicle was present at the time of the accident.  The same day, Tate provided Benson with medical authorizations and a list of providers.  Benson and Tate talked on September 21, 2009, and agreed to schedule the EUO on late October.  On September 24, 2009, Benson met with Greg and Tim Lehrman in Tulsa regarding the agency's communication with plaintiff and whether he had requested second policy of insurance on the Volkswagen or a substitution of the Volkswagen for the truck.  On October 20, 2009, Benson and Tate agreed to schedule plaintiff's EUO for November 11, 2009.  During his EUO on November 11, 2009, Porter reported—for the first time—that another vehicle had crossed the center line, causing him to swerve to the right and leave the road.  On November 18, 2009, and December 1, 2009, Benson received additional medical records and bills and on December 18, 2009, Benson provided her opinion to Farmers. On December 24, 2009, Gilpin called Tate to advise her Farmers would extend UM coverage to plaintiff, leaving a message when Tate was not there.

Plaintiff criticizes Gilpin's questioning during the recorded statement, asserting she should have specifically asked him whether another vehicle caused the accident.  He faults Farmers for hiring an attorney to further investigate the claim, and he criticizes the attorney for not following up on the trooper's statement that he could not be 100 percent sure because he hadn't witnessed the wreck, but believed no other vehicle was involved.

The record shows, though, that Farmers investigation—while not perfect—was reasonable and prompt.  The entire time elapsed between when plaintiff filed his claim (August 4, 2009) and Farmers notified his attorney it would extend UM coverage for the accident (December 24, 2009) was less than five months.  Plaintiff's first mention of a phantom driver was on November 11, 2009, during his EUO.  Farmers did not receive Porter's medical records and expenses until December 1, 2009.

Plaintiff has not shown that Farmers overlooked material facts or that a more thorough investigation would have produced relevant information.  *See Timberlake,* 71 F.3d at 345.  Based on the material presented on summary judgment, the insurer's investigation was "reasonably appropriate under the circumstances."  *See Sims,* 469 F.3d at 891.  The investigation neither hints at a sham defense nor indicates that Farmers intentionally disregarded undisputed facts supporting plaintiff's claim.  *Id.*

### 3. Payment of Proceeds[13]

Although Farmers notified plaintiff's attorney it would extend UM coverage on December 24, 2009, proceeds were not paid until November 4, 2011.[14]  Plaintiff contends the delay from July 15, 2011, until payment of proceeds on November 4, 2011 is further evidence of bad faith on the part of Farmers.

---

[13] In his Amended Complaint of April 30, 2010, Porter asserted claims for breach of contract and bad faith. [Dkt. #10].  He did not specifically allege Farmers had delayed unreasonably in paying proceeds of the UM policy.  Defendant contends the first time plaintiff made such an assertion was in its settlement conference statement in September 2011.  It argues plaintiff should be precluded from arguing bad faith in connection with the delay in payment.  At the time the Amended Complaint was filed, however, plaintiff's counsel had not sent a Final Detail Settlement document to Medicare or received the July 15, 2011 letter advising that Medicare had not made payment related to the accident. The issue of unreasonable delay in payment arose only after receipt of the July 15, 2011, Medicare letter.

On April 6, 2011, Cash sent a Final Detail Settlement document to Medicare.  Medicare sent Cash a letter dated July 15, 2011, advising that it had not made payment related to the "October 1, 2009" "date of incident," and that Medicare was closing its file.  Plaintiff contends that Farmers should have issued payment after it was provided with the July 15, 2011, letter. Farmers asserts that the reference in the letter to a "10/01/09" "incident" created uncertainty about whether Medicare in fact was asserting a lien for the accident, which occurred April 22, 2007.

The record indicates ongoing communications between Cash and Bibb and efforts to clarify Medicare's position.  Bibb drafted and Cash reviewed a July 28, 2011, letter to Medicare. Bibb believed the letter had been sent to Medicare, and was waiting on Medicare's response. However, Cash has no records confirming the letter was, in fact, ever sent.  In September 2011, Bibb learned Cash was taking the position that Farmers should have issued the settlement check based on Cash's representations to Bibb that Medicare told her the "incident date" on Medicare's correspondence was actually the date that Porter became eligible for benefits.

On October 20, 2011—with the issue still not resolved to Farmers' satisfaction—it issued a settlement check listing Medicare as a payee.  On October 25, 2011, Cash wrote Medicare a letter confirming her assistant's conversation with Medicare that it would take at least eight weeks for Medicare to process the settlement check and asking Medicare to confirm it was not making a claim arising from the April 22, 2007, accident.  Bibb was provided with a copy of the letter.  Finally, on October 31, 2011, during a recorded phone call among Cash, Bibb and Medicare, the Medicare representative stated that Medicare was not asserting a subrogation

---

[14] It is undisputed that most of the two-plus year delay resulted from the failure by plaintiff's counsel to submit to Medicare a Final Settlement Detail document until April 6, 2011.  A Final Settlement Detail document was a prerequisite to obtaining a final demand letter from Medicare.

claim arising from the April 22, 2007, accident.  Based upon this representation, on November 4, 2011, Farmers issued a check for UM proceeds that did not list Medicare as a payee.

Under 42 U.S.C. § 1395y(b)(2), Medicare may conditionally pay the medical bills of an injured person, subject to Medicare's right to obtain reimbursement of those payments.  A person who receives a conditional payment from an insurer must reimburse Medicare after the settlement of a personal injury claim.  42 C.F.R. § 411.24(h); 42 U.S.C. § 1395y(b)(2)(B)(ii).  Medicare's reimbursement rights are automatic, and it is not required to give notice of its claim.  42 C.F.R. § 411.21.  Once there has been a judgment or settlement, Medicare has standing to sue the insurer to obtain reimbursement.  42 U.S.C. § 1395y(b)(2)(B)(iii).  When Medicare asserts such a claim, it can recover double the actual amount due from the insurer that did not honor the Medicare reimbursement claim.  *Id.*  Also, if the claimant does not reimburse Medicare, then the insurer must do so even though the insurer has already paid the claimant.  42 C.F.R. § 411.24(i).  Medicare has a similar right to seek reimbursement from an attorney who has received a payment.  42 C.F.R. § 411.24(g) and § 411.26(a).  When Medicare asserts a reimbursement claim, the insurer cannot use exhaustion of policy limits as a defense.  *Id.*  Farmers contends that the practical effect is an insurer could end up paying the same bills three times:  first, to the claimant without protecting Medicare; then Medicare could sue the insurer for double the amount of medical bills that should have been reimbursed to Medicare.

The court concludes that, given (1) the harsh nature of laws and regulations governing reimbursement of Medicare and (2) the confusion surrounding Cash's communications with Medicare, Farmers' conduct was reasonable.

### III. Conclusion

For the foregoing reasons, Farmer's Motion for Summary Judgment [Dkt. #98] is granted.  Its Alternative Motion for Partial Summary Judgment [Dkt. #101]  is moot.

ENTERED this 27th day of January, 2012.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma